In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3497

Tuf Racing Products, Inc.,

Plaintiff-Appellee,

v.

American Suzuki Motor Corporation,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 94 C 50392--Philip G. Reinhard, Judge.

Argued March 31, 2000--Decided July 24, 2000

 Before Posner, Chief Judge, and Ripple and Rovner,
Circuit Judges.

 Posner, Chief Judge.  Tuf, a dealer in
motorcycles in DeKalb, Illinois, in 1987 signed a
franchise contract with Suzuki that the latter
terminated in 1994, precipitating this diversity
suit by Tuf under the Illinois Motor Vehicle
Franchise Act, 815 ILCS 710/1 et seq. Although
Tuf carried other brands as well as Suzuki and so
was able to survive the termination, it claims to
have suffered damages of some $1.2 million from
the alleged breach. A jury agreed that the
termination had been wrongful but awarded Tuf
only $137,000, to which, however, the judge added
$391,318 in attorneys' fees under the franchise
act's fee-shifting provision, 815 ILCS 710/13,
which requires such an award if the plaintiff
"substantially prevails."

 Construed as favorably to Tuf as the record
permits, which is the correct approach in light
of the verdict, the facts reveal that Suzuki
became angry at Tuf for selling motorcycles
outside the geographical area in which its
dealership was located, some of these to other
Suzuki dealers for resale. The franchise
agreement did not forbid either practice (sales
for resale are forbidden except to other Suzuki
dealers), but apparently Suzuki received
complaints from its other dealers about Tuf's
"poaching" on their markets, and so it wrote Tuf

complaining about its conduct. The letter focused on sales for resale but Suzuki's regional manager called Tuf's owner and told him that Suzuki had been getting complaints about Tuf's selling outside its immediate vicinity too and that it should not do that either. When Tuf did not desist from the practices complained of, Suzuki decided to precipitate a breach of the franchise contract by Tuf, which it did by such tactics as denying standard credit terms and then accusing Tuf of failing to maintain a regular plan for sales on credit, as required by the franchise agreement.

All the grounds Suzuki gave in its notice of termination--not only failure to maintain a regular credit plan, but also inadequate sales volume, insufficient inventory, and inadequate promotion--were pretextual, the real reason for termination being that Tuf had irritated Suzuki's other dealers by the two practices that Suzuki had asked it to desist from. The invocation of "pretext" in this context is puzzling. In the law of contracts, while procuring a breach by the other party to your contract would excuse the breach, United States v. Peck, 102 U.S. 64 (1880); Herremans v. Carrera Designs, Inc., 157 F.3d 1118, 1124 (7th Cir. 1998); Swiss Bank Corp. v. Dresser Industries, Inc., 141 F.3d 689, 692 (7th Cir. 1998); Mendoza v. COMSAT Corp., 201 F.3d 626, 631 (5th Cir. 2000); E. Allan Farnsworth, Contracts sec. 8.6, p. 544 (3d ed. 1999), merely having a bad motive for terminating a contract would not. If a party has a legal right to terminate the contract (the clearest example is where the contract is terminable at will by either party), its motive for exercising that right is irrelevant. Kumpf v. Steinhaus, 779 F.2d 1323, 1326 (7th Cir. 1985); Harrison v. Sears Roebuck & Co., 546 N.E.2d 248, 255-56 (Ill. App. 1989). The party can seize on a ground for termination given it by the contract to terminate the contract for an unrelated reason. So if Tuf gave cause for termination (other than "cause" procured by Suzuki's own misconduct, for example in withholding standard credit terms), that would be the end of the case--at least if Tuf were charging merely a breach of contract.

But it is not; we are under the franchise act, which requires franchisors to deal with their franchisees in good faith. 815 ILCS 710/4(b); Kawasaki Shop of Aurora, Inc. v. Kawasaki Motors Corp., U.S.A., 544 N.E.2d 457, 462-63 (Ill. App. 1989). Tuf appears to think that the good-faith provision entitles it to complain about a pretextual termination even if there is good cause for termination. This is incorrect. The cases cited in the preceding paragraph hold that the fact that there is a duty of good faith read

into every contract does not justify judicial inquiry into motive. A party can stand on his contract rights; what he cannot do is resort to opportunistic or otherwise improper behavior in an effort to worm his way out of his contractual obligations. In Dayan v. McDonald's Corp., 466 N.E.2d 958, 974 (Ill. App. 1984), we read that "no case has been cited nor has our research revealed any case where a franchise termination for good cause was overcome by the presence of an improper motive. As a general proposition of law, it is widely held that where good cause exists, motive is immaterial to a determination of good faith performance." Dayan was not decided under the franchise act, but we are given no basis in case law or common sense for supposing that the duty of good faith created by the act sweeps beyond the common law duty. The judge's charge to the jury, however, though not a model of clarity, is consistent with Dayan. For although the jury was asked to decide whether Suzuki had acted in bad faith in terminating Tuf for any of the reasons given in its notice of termination, it was also told that Suzuki would have an affirmative defense if any of the reasons were grounds for termination in the contract, even if the other reasons cited in the notice were not. It would have been more straightforward to instruct the jury to determine simply whether the termination had been a breach of the contract, but Suzuki is not complaining about the charge.

Its main argument for reversal is that the judge improperly allowed Tuf to inject a new ground at trial, what Suzuki calls the "match-up" theory of a breach of the franchise agreement. To understand this argument requires us to delve into the agreement. Section 9.1 provides that if the dealer fails to conduct his business in conformity with the agreement, Suzuki may terminate him upon written notice. Section 9.2 lists 15 violations that Suzuki can base termination on with only 15 days' notice to Tuf, and section 9.3 lists 11 more violations on which termination can be based provided that 60 days' notice is given. The first list contains the more serious violations, like insolvency, and the second the lesser ones, such as failing to maintain the sales volume agreed upon with Suzuki. Suzuki terminated Tuf with 60 days' notice, but the list of violations in the notice does not match up completely with the list in section 9.3. Suzuki argues that even so, given section 9.1, the termination could still be proper. The judge disagreed, and did not let Suzuki argue that, but instead allowed Tuf to argue that the failure of the notice to match the list of violations in section 9.3 showed that the termination was improper.

Read most naturally, section 9.1 does not create a separate basis for termination. All it says is that "if Dealer does not conduct its business in accordance with the requirements set forth herein, Suzuki may terminate this Agreement by giving Dealer written notice of termination," and all this seems to mean is that Suzuki can terminate the franchise agreement if the dealer does not comply with it but that Suzuki must give written notice of the termination. The succeeding sections indicate how much written notice must be given, which depends on the gravity of the violation. If there are grounds for termination other than the 26 listed in sections 9.2 and 9.3, they do not appear in the contract. Were they assumed to exist nevertheless, the contract would have a hole, since it doesn't indicate how much written notice Suzuki must give if it wants to terminate on the basis of a ground for termination not stated in the contract. The contract contains no provision to the effect that "termination based on a violation of the franchise agreement that is not listed in sections 9.2 or 9.3 requires ___ days' written notice." The 26 grounds taken as a whole seem pretty exhaustive, moreover; there is no compelling reason to interpolate additional grounds and thus embrace the ambiguity just identified. The most plausible reading of the contract, therefore, is that a notice of termination that fails to specify any of the 26 listed grounds for violation violates the contract.

Tuf has been shy about making this argument, maybe because a defect in notice would be a technical violation from which no damages could be shown to flow. In any event it argues merely that Suzuki's failure to conform to the requirements of section 9.3 is further evidence of Suzuki's bad faith in terminating the franchise agreement. But here Suzuki drops the ball, failing to argue that bad faith in the sense of bad motive is not a violation of the franchise act. Instead Suzuki contends that Tuf did argue in the district court that the failure of the notice of termination to match the grounds for termination listed in the contract was an independent breach, and complains that the judge prevented it from meeting the argument by forbidding it to cite section 9.1 as an independent basis for termination. However this may be (as near as we can determine, Tuf didn't make the argument but the judge instructed the jury as if it had!), since Suzuki has never explained how its interpretation could be right given the hole in the contract that such an interpretation would create, no injustice was done by its being forbidden to present the interpretation to the jury. Probably no injustice

was done by Tuf's "bad faith" theory either (which may be why Suzuki has failed to oppose it), for remember that the jury was correctly instructed that Suzuki should prevail if it had a basis in the contract for terminating Tuf. Evidently the jury concluded that it did not; and Suzuki's contention that it had a ground for termination not stated in the contract is unsound for the reasons we've explained.

We move on to the issue of damages. Tuf presented its theory of damages by way of its accountant (a C.P.A.), and in the district court Suzuki argued that the accountant should not have been permitted to testify as an expert witness because he does not have a degree in economics or statistics or mathematics or some other "academic" field that might bear on the calculation of damages. The notion that Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), requires particular credentials for an expert witness is radically unsound. The Federal Rules of Evidence, which Daubert interprets rather than overrides, do not require that expert witnesses be academics or PhDs, or that their testimony be "scientific" (natural scientific or social scientific) in character. Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137, 150 (1999); Smith v. Ford Motor Co., No. 99-2656, 2000 WL 709895, *3 (7th Cir. June 2, 2000); United States v. Williams, 81 F.3d 1434, 1441 (7th Cir. 1996); Morse/Diesel, Inc. v. Trinity Industries, Inc., 67 F.3d 435, 444 (2d Cir. 1995). Anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness. Fed. R. Evid. 702; Advisory Committee's Notes to 1972 Proposed Rule 702; United States v. Navarro, 90 F.3d 1245, 1261 (7th Cir. 1996); United States v. Williams, supra, 81 F.3d at 1441; City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548, 563 and n. 17 (11th Cir. 1998). The principle of Daubert is merely that if an expert witness is to offer an opinion based on science, it must be real science, not junk science. Tuf's accountant did not purport to be doing science. He was doing accounting. From financial information furnished by Tuf and assumptions given him by counsel of the effect of the termination on Tuf's sales, the accountant calculated the discounted present value of the lost future earnings that Tuf would have had had it not been terminated. This was a calculation well within the competence of a C.P.A.

The accountant calculated Tuf's damages at about $1.2 million, yet the jury awarded only a bit more than 10 percent of that--leading Suzuki to argue that the damages award should be set aside as "speculative," since the jury of course did

not explain the path that led to the award and it is unclear what that path may have been. We think it pointless, although it might assist defendants who seek to win by attrition, to credit a defendant's complaint that an award of damages should be set aside because it was too small to make sense, which is at root what Suzuki is arguing. The argument implies that upon a retrial the plaintiff is likely to obtain a higher award (since the previous award was irrationally low) that the appellate court will sustain. In any event, such an argument is blocked by the principle that if the award is within the bounds of reason, the fact that the jury may not have used reason to arrive at it--may instead have negotiated an unprincipled compromise in order to avoid deadlock--will not prevent it from being upheld. Kasper v. Saint Mary of Nazareth Hospital, 135 F.3d 1170, 1177 (7th Cir. 1998); Outboard Marine Corp. v. Babcock Industries, Inc., 106 F.3d 182, 186-87 (7th Cir. 1997). In other words, the court looks only at the "bottom line," to make sure it's reasonable, and doesn't worry about the mental process that led there. Since the jury is a collective body rather than a single mind, since it does not write up its findings as the judge does when he's the finder of fact, and since the law protects jurors from being interrogated about their reasoning processes, it really isn't feasible to insist upon a demonstration that the jury arrived at its reasonable bottom line by reasoning to it the way a professional judge would do, rather than by guesswork, intuition, or compromise.

Suzuki's other complaints about the award are niggling and we move on to the last issue, that of attorneys' fees. Suzuki argues that Tuf did not prevail because it obtained so much less than it asked for. It prevailed in the literal sense, but did it substantially prevail? We cannot find any cases that interpret this term in the franchise act. The parties assume as shall we that we can turn for guidance to the case law that has developed around the issue of when a plaintiff who has won much less than he sought is entitled to an award of attorneys' fees under rules or statutes entitling prevailing parties to "reasonable" such fees. That case law indicates that had Tuf obtained merely nominal damages, it would not have been entitled to any award of fees, Farrar v. Hobby, 506 U.S. 103, 114 (1992); Fletcher v. City of Fort Wayne, 162 F.3d 975, 976 (7th Cir. 1998); Bristow v. Drake Street Inc., 41 F.3d 345, 352 (7th Cir. 1994); Coutin v. Young & Rubicam Puerto Rico, Inc., 124 F.3d 331, 339 (1st Cir. 1997), and that if it had incurred attorney's fees that were disproportionate to a reasonable estimate of the value of its claim, it could not recover all those fees, but only the

reasonable proportion, which is to say the amount that would have been reasonable to incur had the value of the claim been estimated reasonably rather than extravagantly. Farrar v. Hobby, supra, 506 U.S. at 115; Hensley v. Eckerhart, 461 U.S. 424, 434 (1983). Suzuki has shown neither of these things. But it argues in addition that the rule in this circuit is that a plaintiff who fails to obtain an award of damages equal to at least 10 percent of the amount he sought will be denied any award of fees, and at one point before trial Tuf had asked for $1.5 million although before trial it scaled down its demand. (Its complaint did not demand a specific amount, but only an amount greater than the then jurisdictional minimum in a diversity case of $50,000, since raised by Congress to $75,000.)

Several cases in this circuit do suggest that a plaintiff's failure to obtain at least 10 percent of the damages it had sought will weigh heavily against any award of attorneys' fees. Indeed, Perlman v. Zell, 185 F.3d 850, 859 (7th Cir. 1999), states this in a way that makes it sound like a rule, although the cases it cites for the rule treat it, rather, merely as a factor to consider along with other factors weighing for or against an award of attorneys' fees. Cole v. Wodziak, 169 F.3d 486 (7th Cir. 1999); Fletcher v. City of Ft. Wayne, supra, 162 F.3d at 976. (We cannot find a case in any other court that mentions the 10 percent rule or factor.) Since a defendant must take seriously a large demand and prepare its defense accordingly, it is right to penalize a plaintiff for putting the defendant to the bother of defending against a much larger claim than the plaintiff could prove. But here the plaintiff scaled back its claim before trial and obtained more than 10 percent of the scaled-back demand from the jury. That seems to us enough to take the case out of the "rule" for which Suzuki contends.

The fact that the attorneys' fees awarded exceed the damages award is not decisive either. Because the cost of litigating a claim has a fixed component, a reasonable attorney's fee in the sense of the minimum required to establish a valid claim can exceed the value of the claim. Hyde v. Small, 123 F.3d 583, 584-85 (7th Cir. 1997). Yet one purpose of fee shifting is to enable such claims to be litigated, and the purpose would be thwarted by capping the attorneys' fees award at the level of the damages award. There is no evidence that the $391,000 that Tuf expended to establish its claim--an amount that was, incidentally, little more than a third as great as Suzuki's expenditure in defending against it--was more than was reasonably necessary for Tuf to prevail.

The cases we have cited on the issue of attorneys' fees are cases interpreting federal fee-shifting statutes, but Tuf's entitlement is created by the law of Illinois. In default of relevant Illinois cases, however, the parties have cited to us federal cases, assuming, reasonably enough, that the common-sense principles that guide federal courts in determining attorneys' fees issues would commend themselves to Illinois courts as well. But in addition we have found one Illinois case that makes the essential point that the damages award does not cap the fee award. Pitts v. Holt, 710 N.E.2d 155 (Ill. App. 1999).

Affirmed.