**Linda ELLIS, Individually and as Special Administrator for the Estate of Walter Tom, Deceased, Plaintiff,**

**v.**

**PNEUMO ABEX CORPORATION, et al., Defendant.**

**Case No. 11–cv–1128**

United States District Court, C.D. Illinois, Peoria Division.

Entered July 30, 2014

Filed July 31, 2014

James R. Wylder, Andrew J. Kelly, Wylder Corwin Kelly LLP, Bloomington, IL, for Plaintiff Linda Ellis

Robert Westwood Scott, Timothy Whitzel Swain, II, Swain Hartshorn & Scott, Peoria, IL, Lise Alexandra Newton, Foley & Mansfield, St. Louis, MO, for Defendant Pneumo Abex Corporation

## ORDER

MICHAEL M. MIHM, United States District Judge

This matter is now before the Court on Defendant Pneumo Abex Corporation's ("Defendant" or "Pneumo Abex") Motion to Exclude the Expert Opinion Testimony of Dr. Arthur Frank (ECF No. 30). Defendant's Motion (ECF No. 30) is hereby GRANTED.

## JURISDICTION

On June 20, 2011, this Court found the Defendants in this case had shown sufficient evidence to satisfy the requirements for federal officer removal pursuant to 28 U.S.C. § 1442(a)(1). (ECF No. 21).

## PROCEDURAL HISTORY

On February 16, 2010, Plaintiff Linda Ellis ("Plaintiff") filed a Complaint in the Circuit Court of the Eleventh Judicial Circuit of McLean County, Illinois, alleging Walter Tom ("Tom"), now deceased, developed lung cancer as a result of exposure to materials containing asbestos. (ECF No. 16 at 2).

Plaintiff alleges Tom's exposure to asbestos-containing materials occurred: (1) during his service aboard the USS Sylvania (1969–1971) and the USS Vogelsang [sic] (1971–1973); (2) during his employment as a boilerman at NASA (1973–1979); and (3) when he did work on automotive brakes using brake linings manufactured by Bendix. (ECF No. 1–2 at 1–2).

Plaintiff's Complaint named a number of defendants whose products contained asbestos, including Pneumo Abex. Pneumo Abex was in the business of manufacturing and distributing products containing asbestos during the times relevant to the allegations. *Id.* Plaintiff's sole claim against Defendant is for conspiracy under Illinois law. (ECF No. 31 at 3). Plaintiff previously conceded she does not have evidence that Tom was exposed to asbestos from any product manufactured or supplied by Defendant. *Ellis v. Pneumo Abex Corporation*, No 11–66774–ER (E. Dist. Penn. filed Jan. 3, 2013, (ECF No. 96 at 2) herein referred to as "JMDL Case"). Plaintiff alleges Tom's fatal lung cancer resulted from Defendant's participation in a conspiracy to conceal the effects of asbestos. (ECF No. 31 at 3). For purposes of the present motion, the inquiry surrounds Plaintiff's allegation that the Defendant conspired with others to delete from a published study reference to research conducted by Dr. Leroy Gardner in the 1930s and 1940s in which mice subjected to asbestos developed cancer.

Discovery conducted in the case revealed additional companies whose asbestos-containing equipment products may have been among the equipment Tom worked with as a boilerman. (ECF No. 8 at 2). On January 21, 2011, pursuant to leave granted by the McLean County Circuit Court, Plaintiff filed an amendment to her already-amended complaint that included allegations against Westinghouse Electric Company, LLC ("Westinghouse") and other defendants regarding their asbestos-containing equipment used on the USS Sylvania and USS Vogelsang [sic]. *Id.* at 2–3.

On or about March 28, 2011, Westinghouse filed a notice to remove this case to federal court, citing 28 U.S.C. § 1442(a)(1) and the federal contractor defense as initially set out in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). As noted *supra,* page 834, on June 20, 2011, the U.S. District Court for the Central District of Illinois entered an Order finding Defendants had shown evidence sufficient to satisfy the requirements for federal officer removal pursuant to 28 U.S.C. § 1442(a)(1). (ECF No. 21).

On July 29, 1991, the Judicial Panel on Multidistrict Litigation ("JPML") entered an Order transferring all asbestos-related injury and wrongful death cases pending in the federal courts to the United States District Court for the Eastern District of Pennsylvania for coordinated pretrial proceedings pursuant to 28 U.S.C. § 1407. (ECF No. 23) That Order also applied to "tag-along actions"—*i.e.,* suits involving common questions of fact filed after January 17, 1991. *Id.* On July 7, 2011, this case was transferred to the Eastern District of Pennsylvania. *Id.*

On January 3, 2013, an Order was entered on Defendant's Motion for Summary Judgment in the JMDL Case. *See Ellis v. Pneumo Abex Corporation*, No 11–66774–ER (E. Dist. Penn. filed Jan 3, 2013, (ECF No. 96)). In that Order Judge Robreno denied Defendant's motion, finding:

> In light of Plaintiff's new evidence, under the rationale set for in *Rodarmel*[1] (and later applied in *Menssen*[2]), there is a genuine dispute of material fact because the evidence could support a reasonable inference that Abex agreed to the suppression not only of the results

---

1. *Rodarmel v. Pneumo Abex, L.L.C.*, 354 Ill. Dec. 6, 957 N.E.2d 107 (Ill.App. 4th Dist. 2011) ("*Rodarmel* court").

2. *Menssen v. Pneumo Abex Corp.*, 363 Ill.Dec. 543, 975 N.E.2d 345 (Ill.App. 4th Dist.2012).

of that study but of the future study proposed by Dr. Gardner. (Citation omitted).

*Id.* at 26–27.

With respect to the issue presently before this Court, Judge Robreno specifically explained:

[T]hat Defendant has challenged Plaintiff's expert evidence [3] as being scientifically invalid—and, therefore inadmissible—because of flawed methodology. However, the Court deems this type of challenge (i.e., a *Daubert* challenge), more appropriate for resolution by the trial court.

*Id.* at 27.

On July 22, 2013, a conditional remand order was issued in the JMDL Case. (ECF No. 26). All claims in this action except for the severed damages claims were remanded to the U.S. District Court for the Central District of Illinois, and the case was reopened. *Id.*

Defendant filed their Motion to Exclude the Expert Opinion Testimony of Dr. Arthur Frank (ECF No. 30) under Federal Rule of Evidence 702, arguing Dr. Frank's opinions are: "(1) irrelevant to key issues; (2) devoid of factual foundation; (3) the product of an unexplainable extrapolation from underlying facts; and (4) based solely on methodologically flawed research." (ECF No. 31 at 2).

### STANDARD

██ Under Federal Rule of Evidence 702, the Court's role in determining the admissibility of expert testimony is that of a gatekeeper. *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 142, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct.

2786, 125 L.Ed.2d 469 (1993). The *Daubert* standard applies to all expert testimony, not just to scientific testimony. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147–48, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). To perform its gatekeeper role, the Court uses a two-step methodology: (1) it must determine "whether the expert's testimony pertains to scientific knowledge." That is, the testimony must have been subjected to the scientific method; and (2) "whether the evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue. That is, the suggested scientific testimony must fit the issue to which the expert is testifying." *Porter v. Whitehall Labs., Inc.,* 9 F.3d 607, 614, 616 (7th Cir.1993) (internal quotation marks omitted); *see* FED. R. EVID. 702. In other words, the expert's opinion must be reliable and relevant. *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786.

██ A court should consider four factors in determining the soundness of the expert's methodology:

(1) whether the proffered conclusion lends itself to verification by the scientific method through testing; (2) whether it has been subjected to peer review; (3) whether it has been evaluated in light of the potential rate of error of the scientific technique; and (4) whether it is consistent with the generally accepted method for gathering the relevant scientific evidence. *Cummins v. Lyle Industries,* 93 F.3d 362, 368 (7th Cir.1996), citing *Daubert,* 509 U.S. at 594–95, 113 S.Ct. 2786.

These factors, however, are not exclusive and do not constitute a definitive checklist. *Kumho,* 526 U.S. at 141, 119 S.Ct. 1167.

---

**3.** Plaintiff wants to call Dr. Frank so he can opine that the results of the Saranac study "would have been significant scientific evi-

dence on the issue of whether there was a relationship between asbestos and cancer." *Id.* at 25.

The key concern is that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152, 119 S.Ct. 1167.

"The principle of *Daubert* is merely that if an expert witness is to offer an opinion based on science, it must be real science, not junk science." *Tuf Racing Products, Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir.2000). The Court's role is not to determine the reliability of the data itself, as that is for the jury to decide. *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 808 (7th Cir.2013). Rather, "the [C]ourt's role is generally limited to assessing the reliability of the methodology—the framework—of the expert's analysis." *Id.*

### FACTUAL BACKGROUND

As noted *supra*, page 835, Plaintiff alleges Defendant conspired with others to delete reference to research conducted by Dr. Leroy Gardner. The Court begins its analysis with a review of the substance of Dr. Gardner's research.

*Dr. Gardner's Saranac Study*

The *Rodarmel* court, to which both parties provide significant citation, discussed at length the background and results of the Saranac study on which Dr. Frank bases his testimony, but an account is also necessary here. In 1936, American Brake Shoe and Foundry Company (the predecessor of Pneumo Abex) and at least eight other companies agreed to finance a study that aimed to find out more about the occupational disease asbestosis. *Rodarmel*, 354 Ill.Dec. 6, 957 N.E.2d at 111. At least one of those companies, Johns–Manville, did so with the hope of gathering scientific data favorable to the asbestos industry "that would stand up in court." *Id.* On a broad level, the scientific aim of Dr. Gardner's study was "to answer various questions about asbestosis, including the mechanics of its causation and under what conditions it progressed." *Id.*, 354 Ill.Dec. 6, 957 N.E.2d at 112.

Dr. Gardner found some results that were " 'suggestive but not conclusive' " of a relationship between asbestos and cancer in humans, but a more pertinent part of his research for the present action involved lung cancer in white mice. *Id.*, 354 Ill.Dec. 6, 957 N.E.2d at 113. Like in the human cases, Dr. Gardner considered his results " 'suggestive but not conclusive' " after having his curiosity "piqued by his discovery of 'malignant tumors' in the lungs of 8 of the 11 mice that he had exposed to asbestos fibers for 15 to 24 months." *Id.*, 354 Ill.Dec. 6, 957 N.E.2d at 113. Importantly, Dr. Gardner "pointed out the flaws in his unintentional cancer experiment." *Id.*, 354 Ill.Dec. 6, 957 N.E.2d at 113. Those flaws included using a strain of mice more susceptible to cancer for the asbestos dusting than the other dustings,[4] a low sample size, and the lack of a control group of unexposed mice of the same strain and age. *Id.*, 354 Ill.Dec. 6, 957 N.E.2d at 114. In an attempt to correct these flaws, Dr. Gardner applied for funding to conduct controlled experiments from the Committee on Cancer Research at the National Cancer Institute in Bethesda, Maryland ("the Committee," also referred to as "the National Advisory Cancer Council," or "the Council"). *Id.*, 354 Ill.Dec. 6, 957 N.E.2d at 114. In his application, Dr. Gardner admitted his previous results " 'meant nothing' " with respect to cancer, due to the aforementioned

---

4. As the *Rodarmel* court pointed out, in addition to the asbestos group, mice were "exposed to 4 different kinds of dust, including pure quartz." *Rodarmel*, 354 Ill.Dec. 6, 957 N.E.2d at 113–14.

flaws. *Id.*, 354 Ill.Dec. 6, 957 N.E.2d at 115. On January 8, 1944, the Committee considered Dr. Gardner's application, ultimately rejecting it "because finding tumors in 81.8% of 11 mice, in uncontrolled conditions, meant nothing." *Id.*, 354 Ill. Dec. 6, 957 N.E.2d at 116–17.

On September 30, 1948, almost two years after Dr. Gardner died, Saranac Laboratory issued a report, based on Dr. Gardner's notes, regarding the dusting experiments. *Id.*, 354 Ill.Dec. 6, 957 N.E.2d at 118. The report listed four basic conclusions of the experiments: (1) the cause of asbestosis was the structure of the asbestos fibers and not the fibers' chemical composition; (2) inhaling asbestos fibers did not alter significantly "the course of experimentally[-]induced tuberculosis in animals;" (3) the forming of an asbestos body around an inhaled asbestos fiber limited the reaction's progression after asbestos exposure ceased; and (4) aluminum did not prevent irritation of tissues caused by asbestos fibers like it prevented irritation caused by quartz particles. *Id.*, 354 Ill. Dec. 6, 957 N.E.2d at 118.

Published in 1951, the final report contained reference to Dr. Gardner's mouse study, but it did not mention the tumors or any reference to cancer.[5] *Id.*, 354 Ill.Dec. 6, 957 N.E.2d at 119. In addition, the final report deleted reference to section 92[6] of an earlier draft. *Id.*, 354 Ill.Dec. 6, 957 N.E.2d at 120. The report's authors omitted reference to cancer and tumors based on the advice of Dr. Gardner, who still believed a study " 'directed towards determining the incidence, if any, of cancer as a result of asbestos dust exposure[ ]' " was necessary. *Id.*, 354 Ill.Dec. 6, 957 N.E.2d at 122. The fact that the 1951 report did not contain this information is the basis for Plaintiff's allegation "that the conspirators deleted reference to asbestos causing cancer" from the report. (ECF No. 33 at 1).

*Dr. Frank's Proffered Testimony*

In his January 9, 2012 deposition, Dr. Frank testified that the original version of the report, which contained reference to cancer and tumors, could have been scientifically publishable "[i]f you would have put all the caveats in there" that disclosed the uncertainty as to whether the tumors were benign or malignant. (ECF No. 31–5 at 22). Dr. Frank contends such a publication would have had merit because it would have alerted the scientific community to the need "to further clarify what was the nature of" the abnormal lesions that developed after the mice inhaled asbestos. *Id.*

Dr. Frank was again deposed on April 6, 2012. He testified he was familiar with Dr. Gardner's Saranac study and that he knew the references to the tumors and cancer had been deleted from the final report. (ECF No. 31–6 at 3). Dr. Frank's familiarity was such that he knew of the methodological flaws in Dr. Gardner's study. For example, Dr. Frank knew that despite the scientific necessity of having a control group of mice when the rate of spontaneous tumor development in the experimental mice is unknown, Dr. Gardner did not use a control group in his study.

---

5. The *Rodarmel* court noted that although the report contained reference to a supplement that would address issues in Dr. Gardner's research, including the tumors' exact nature, no such supplement was ever found in the record. *Rodarmel,* 354 Ill.Dec. 6, 957 N.E.2d at 119–120.

6. Section 92 highlighted the "material contradiction" between Dr. Gardner's experimental notes, which considered the tumors to be benign adenomas, and his outline of a proposed monograph and application to the National Cancer Institute, which referred to the tumors as cancer. *Rodarmel,* 354 Ill.Dec. 6, 957 N.E.2d at 120.

*Id.* at 21, 23. By contrast, Dr. Frank did not know the strain of mice used in Dr. Gardner's experiment, the age of those mice, or the rate at which that strain spontaneously develops tumors. *Id.* at 21–22. Dr. Frank admitted the age of mice used is important because the chances of developing a tumor increase with a mouse's age. *Id.* at 21–22. In addition, Dr. Frank testified rates of spontaneous tumor development vary among mice but can reach rates of up to eighty or ninety percent. *Id.* at 21.

Dr. Frank further opined that the fact that the mice had contracted tumors, regardless of whether they were malignant or benign, would have been "significant scientific evidence on the issue of whether there was a relationship between asbestos and cancer." *Id.* at 3. Dr. Frank, however, admitted to the inability to "say to a reasonable degree of medical certainty that [Dr. Gardner's] experiment shows that asbestos causes cancer in humans." *Id.* at 30.

### DISCUSSION

The claims made by Plaintiff are not novel in Illinois. Judge Robreno noted that *Rodarmel* and *Menssen* set forth the current state of Illinois law. In those cases, the Illinois courts held the civil conspiracy claim failed as a matter of law because the plaintiffs did not present a "qualified expert opinion that the tumorous mice were scientific evidence of a [causal] relationship between asbestos and cancer." *Rodarmel,* 354 Ill.Dec. 6, 957 N.E.2d at 135; *see Menssen,* 363 Ill.Dec. 543, 975 N.E.2d at 355. Plaintiff argues the testimony of Dr. Frank fills the "evidentiary gap" articulated in *Rodarmel.* (ECF No. 33 at 3).

In holding Pneumo Abex was entitled to judgment notwithstanding the verdict, the *Rodarmel* court found there was no evidence Pneumo Abex agreed with other companies to suppress or misrepresent the health hazards of asbestos. *Rodarmel,* 354 Ill.Dec. 6, 957 N.E.2d at 135. The court came to this conclusion "not only because of a lack of duty but also because of a lack of clear and convincing evidence on the agreement element of a civil conspiracy." *Rodarmel,* 354 Ill.Dec. 6, 957 N.E.2d at 135. Highlighting the issue this Court now faces, the *Rodarmel* court explained:

> [I]f a scientific journal had published an article stating that Gardner had proved, by animal experimentation, that asbestos caused lung cancer, it might have gone a long way toward sealing the acceptance of the causal connection between asbestos and cancer. But that proposition does not address the question of whether such an article would have deserved to be published in a scientific journal.
>
> ¶ 124 In other words, in suppressing the cancer references, the sponsors could have done the right thing for the wrong reason. Even if the tumors in the mice scientifically proved nothing, publicizing them could have been prejudicial to Johns–Manville's business, or Johns–Manville could have had that fear. So, yes, it is an eminently reasonable inference that Johns–Manville, Abex, and other companies were concerned more about their own skin than about scientific integrity. The question, though, is not whether Abex's motives were pure. Instead, the question is whether Abex agreed "to commit an unlawful act or a lawful act in an unlawful manner." *Adcock [v. Brakegate, Ltd.],* 164 Ill.2d [54] at 64, 206 Ill.Dec. 636, 645 N.E.2d 888 [1994]. *As far as we can see, it was not against the law, and it was not tortious, for the financing corporations to conceal the occurrence of tumors in a small*

*group of mice if (1) the tumors were not scientific evidence of a relationship between asbestos and cancer and (2) it was unclear that any of the tumors were in fact cancerous.* Granted, from the vantage of hindsight, we now know it is a scientific fact that asbestos causes cancer in humans. But it does not necessarily follow that asbestos caused the tumors (benign or malignant) in the eight or nine mice at Saranac Laboratory, some of which were genetically prone to develop tumors under any conditions. *Unless Abex had notice that the tumorous mice were scientific evidence that asbestos caused cancer, Abex did not enter into a conspiratorial agreement by agreeing to conceal information about the tumorous mice—because concealing the information was not an unlawful or tortious act.* It cannot be unlawful to hide information that is devoid of significance: information that, as Murphy put it, was "not of any tremendous value." *See In re Angotti [v. Celotex Corp.]*, 812 S.W.2d 742, 749 (Mo.Ct. App.1991). ("The desire to keep [a medical advisor's] observations and evaluation confidential does not show actual knowledge of a health hazard to an individual working as an insulator.").

*Rodarmel,* 354 Ill.Dec. 6, 957 N.E.2d at 133–34 (emphasis added).

Plaintiff explains Dr. Frank would provide expert testimony on issues relating to the scientific nature of Dr. Gardner's finding of tumors in eleven mice. (ECF No. 31 at 4). Dr. Frank testified in a deposition on January 8, 2012 (ECF NO. 31–5), February 14, 2012 (ECF No. 33–3) and April 6, 2012 (ECF No. 31–6). Plaintiff was also given the opportunity to make a supplemental filing addressing the scientific validity of the Saranac study. Dr. Frank's supplemental affidavit, however, fails to address any of the previously-highlighted deficiencies set forth in Pneumo

Abex's Motion to exclude his testimony. Rather, Dr. Frank merely notes:

Given that animal data is much easier to accumulate than human data, and because it is inappropriate to expose humans knowingly to hazardous materials, animal studies, then, as now, have a significant role in understanding the potential in materials to cause disease. The testing done at Saranac was appropriate, and the evaluation of the tissues was also something that was regularly carried out at their laboratories.

(ECF No. 36–1 at 2).

Dr. Gardner submitted his preliminary findings from the Saranac study in the form of a research grant requesting funding to the National Cancer Institute. (ECF No. 31–28). In a letter dated March 15, 1943, Dr. Gardner recognized the limitations of his research involving the mice, specifically noting that the experiment was not done to study carcinogenic effects. (ECF No. 31–26 at 2). Dr. Gardner also identified the lack of meaningful results, explaining "[o]bviously under [the conditions of the experiment], the result with asbestos mean nothing." *Id.* Dr. Gardner's proposal was ultimately reviewed during the National Advisory Cancer Council's January 8, 1944 meeting held in Bethesda, Maryland. The doctors reviewing the proposal were critical of the proposal on a number of grounds. All of their criticisms are pertinent to the discussion of Dr. Frank's opinions.

■ As it relates to Dr. Gardner's experience with cancer and asbestos research, without any factual support, Dr. Frank opines that:

At the time in question, the Saranac Laboratories run by Dr. Gardener (sic) were facilities that were appreciated as being able to undertake scientific investigations, such as their studies on asbes-

tos and its ability to cause disease in animals, and industries would find their way to their laboratories for the undertaking of such studies.

(ECF No. 36–1). But the record shows the Council was critical of Dr. Gardner's lack of experience in cancer research and in the handling of the particular type of material. (ECF No. 31–29 at 6). Indeed, the Council specifically noted Dr. Gardner was inexperienced in this type of research. *Id.* ("I think we are hardly justified in appropriating $10,000 for it in a laboratory that isn't experienced in cancer research or in handling this particular type of material."). Dr. Frank provides no factual basis to contradict the opinion of Dr. Gardner's contemporaries. Thus, it constitutes nothing more than a foundationless opinion, one that does not fulfill *Daubert's* requirement that an opinion be "based on science." *Tuf Racing Products, Inc.*, 223 F.3d at 591.

Moreover, the Council was critical of the use of mice as subjects. The Council said mice were not the best subjects, indicating "it is quite likely that you can induce cancer of the lung in mice in the strains that have genetic tendency for cancer of the lung." (ECF No. 31–29 at 6). Meanwhile, Dr. Frank explains "animal data is much easier to accumulate than human data," (ECF No. 36–1 at 2), but he fails to address the Council's concerns. Dr. Frank does say the unpublished data may have been able to corroborate harder-to-obtain human data. *Id.* The unpublished data, however, "mean[t] nothing," (ECF No. 31–26 at 2), and data that have no significance cannot reliably be said to bolster other data. Furthermore, whether animal data is easier to accumulate than human data is irrelevant to the issue at hand, as it does not speak directly to the question of whether mice were appropriate subjects in the unintentional cancer study. This part of Dr. Frank's testimony, then, also fails

under *Daubert,* as it is neither reliable nor relevant. *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786.

The Council was also highly critical of the fact that Dr. Gardner's experiment was uncontrolled. (ECF No. 31–29 at 7, "I wouldn't consider that figure, uncontrolled, as of any significance whatever, unless I knew the strain of the animals, knew it was a low strain."). Dr. Frank provides no information on how the uncontrolled nature of the study can have scientific validity. In fact, Dr. Frank admits that when, as here, certain characteristics of animals strains are unknown, controls should be run. (ECF No. 31–6 at 21). Therefore, Dr. Frank's bald assertion that the results would have been significant if published fails under *Daubert,* as it is based on uncontrolled, "junk science." *Tuf Racing Products, Inc.*, 223 F.3d at 591.

Finally, Dr. Frank's testimony does nothing to answer affirmatively the question central to this case: whether Pneumo Abex entered into an unlawful, conspiratorial agreement to conceal the information about the tumorous mice. As noted *supra,* pages 839–40, if, at the time the final report was published, Pneumo Abex did not have notice that asbestos *caused* cancer, they did not enter into a conspiratorial agreement. Based on the record presented in this case, the Court finds Dr. Frank is not a "qualified expert that can testify that the tumorous mice were scientific evidence of a [causal] relationship between asbestos and cancer." *Rodarmel,* 354 Ill. Dec. 6, 957 N.E.2d at 135; *see Menssen,* 363 Ill.Dec. 543, 975 N.E.2d at 355. Dr. Frank's testimony does not go as far as to say Dr. Gardner's study was evidence of causation. In fact, Dr. Frank says the opposite, admitting he could not "say to a reasonable degree of medical certainty

that [Dr. Gardner's] experiment shows that asbestos causes cancer in humans." (ECF No. 31–6 at 30). Therefore, the Court finds Dr. Frank's testimony to be inadmissible at trial.

This ruling (that Plaintiff would be unable to fill the "evidentiary gap" articulated in *Rodarmel*), taken in context with Judge Robreno's Order denying summary judgment, appears to resolve the dispute as to whether there is any support for a reasonable inference that Abex agreed to suppress the results of both Dr. Gardner's Saranac study and his proposed future study. Therefore, judgment in favor of the Defendant would be appropriate. Plaintiff is directed to file a brief within 14 days of this Order if she believes there remains evidence that would support her theory in this case given the previous rulings of the JMDL and this Court.

## CONCLUSION

For the reasons stated herein, Defendant Pneumo Abex Corporation's Motion to Exclude the Expert Opinion Testimony of Dr. Arthur Frank (ECF No. 30) is GRANTED. Plaintiff is directed to file a brief within 14 days of this Order if she believes there remains evidence that would support her theory in this case given the previous rulings of the JMDL and this Court.